389 So.2d 807 (1980)
Woodrow W. RIVERS, Plaintiff-Appellant-Appellee,
v.
SCHLUMBERGER WELL SURVEYING CORP.,[1] et al., Defendants-Appellees-Appellants.
No. 7729.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1980.
*809 James A. Cobb, Jr., New Orleans, for defendant-appellee-appellant.
Francis Emmett, New Orleans, George J. Dowd, Chalmette, for defendant-appellant-appellee.
Fuhrer & Flournoy, Leonard Fuhrer, Alexandria, and Rivers & Willson, Larry Rivers, Alexandria, for plaintiff-appellee-appellant.
Before CULPEPPER, DOMENGEAUX and CUTRER, JJ.
CUTRER, Judge.
Woodrow W. Rivers brought this suit under the Jones Act and General Maritime Law against Schlumberger Well Surveying Corporation (Schlumberger), Elevating Boats, Inc. (Elevating Boats) and Meldeans, Inc. (Meldeans) for losses due to injuries received when Rivers fell into a hole, or washout, near the dock where the vessel "Billiot" was berthed. The petition alleged that he was jointly employed by the three defendants as a seaman serving aboard the Billiot. He alleges that each defendant was his employer within the meaning of the Jones Act.
Schlumberger answered and filed a third party demand against Elevating Boats claiming that under the provisions of a contract between Schlumberger and Elevating Boats, Elevating Boats should indemnify Schlumberger for claims such as that of Rivers. Schlumberger also seeks attorney's fees for defending the suit.
Schlumberger states in their brief that Elevating Boats and Meldeans filed a third party demand against Schlumberger seeking indemnity for any liability to Rivers that they might incur. Such demand, however, does not appear in the record and we do not pass on same.
The trial court found Meldeans, but not Schlumberger or Elevating Boats, to be the Jones Act employer of Rivers. Judgment *810 was rendered in favor of Rivers and against Meldeans for $229,000.00 plus medical expenses and $750.00 travel expenses. The trial court did not rule on Schlumberger's third party demand against Elevating Boats.
The issues presented by these appeals are as follows:
(1) Whether Schlumberger was an employer of Rivers at the time of the accident, within the meaning of the Jones Act;
(2) Whether Elevating Boats should be held liable on the ground that Meldeans was the alter ego of Elevating Boats;
(3) Whether Meldeans was liable for Rivers' losses under the circumstances presented;
(4) Whether Rivers can recover from Schlumberger under Louisiana Tort Law;
(5) What disposition should be made of the third party demands of Schlumberger; and
(6) Whether the trial court correctly decided the quantum of damages.
The basic facts are that Woodrow Rivers was captain of the jack-up boat, Billiot. That vessel was owned by Meldeans. It was being used exclusively by Schlumberger, which provided the dock at which the Billiot was berthed. Rivers had been an employee of Elevating Boats until he requested a change of location so that he could be nearer his home. In response to that request, he was transferred to the employment of Meldeans as captain of the Billiot. Meldeans had an agreement with Elevating Boats by which Elevating Boats located rental customers for the two boats owned by Meldeans. For this service, Elevating Boats received six percent of the rentals paid for the services of Meldeans' boats.
On the night of January 28, 1977, plaintiff left his boat to dispose of a can of paint chips which he had scraped from the engine room of the Billiot. He stepped off the stern of the Billiot onto a walkway (approximately 4 feet wide and 100 feet long) which was adjacent to the bank of Bayou Sycamore. Rivers crossed the walkway and proceeded to step onto the bank to empty the can of scrapings. He stepped across the hole and as he applied his weight to his foot on the bank of the hole, the bank gave way, causing him to fall into the hole. By the next morning, he was stiff and suffering pain. This started the medical history which was to culminate in spinal surgery, from which plaintiff has never fully recovered.
Before entering into a discussion of the issues we want to point out that our scope of review in this case is severely limited by federal law and we must confine ourselves to those limits in examining the trial judge's findings. This court, in the case of Hocut v. Insurance Company of North America, 254 So.2d 108, 111 (La.App. 3rd Cir. 1971), writs ref'd, 256 So.2d 292 (La. 1972), made the following observation in this regard:

"We deem it proper to point out, before beginning our discussion of the issues herein, that the scope of our review in Jones Act cases is the same as that accorded the Federal appellate courts. Trahan v. Gulf Crews, Inc., La.App., 246 So.2d 280; and cases cited therein. In Gallick v. Baltimore and Ohio Railroad Company, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618, the Supreme Court of the United States in quoting from Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 defined those limits as follows:

`It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to *811 select from among conflicting inferences and conclusions that which it considers most reasonable. Washington & Georgetown R. Co. v. McDade, 135 U.S. 554, 571, 572, 10 S.Ct. 1044, 1049, 34 L.Ed. 235; Tiller v. Atlantic Coast Line R. Co., supra, 318 U.S. [54] 68, 63 S.Ct. [444] 451 [87 L.Ed. 610], 143 A.L.R. 967; Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' 321 U.S., at 35, 64 S.Ct. at 412."
With those principles in mind, we proceed with the issues presented herein.
(1) Whether Schlumberger Was an Employer of Rivers at the Time of the Accident.
To recover under the Jones Act, an employee must show that he was a seaman at the time of accidental injury. Rivers' status as a seaman at the time of injury is not disputed herein. The claimant must also establish an employer-employee relationship at the time of the injury. As to whether a claimant may have more than one employer under the provisions of the Jones Act, the recent case of Guidry v. South Louisiana Contractors, Inc., 614 F.2d 447, 452 (5th Cir. 1980), the court held as follows:

"A Jones Act claim also requires proof of an employment relationship either with the owner of the vessel or with some other employer who assigns the worker to a task creating a vessel connection, for `[b]y the express terms of the Jones Act an employer-employee relationship is essential to recovery.' Spinks v. Chevron Oil Co., 507 F.2d 216, 224 (5th Cir. 1975). The employer need not be the owner or the operator of the vessel. Barrios v. Louisiana Construction Materials Co., 465 F.2d 1157 (5th Cir. 1972). Independent contractors may be liable under the Act, Mahramas v. American Export Isbrandtsen Lines, Inc., 475 F.2d 165, 171 (2d Cir. 1973); Barrios v. Louisiana Construction Materials Co., 465 F.2d 1157 (5th Cir. 1972). And a third person who borrows a worker may become his employer if the borrowing employer assumes enough control over the worker. Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1969). However, even if a seaman is deemed to be a borrowed servant of one employer, this does not automatically mean that he ceases to be his immediate employer's servant for Jones Act purposes. Spinks v. Chevron Oil Co., 507 F.2d 216, 224 (5th Cir. 1975). It may also be possible for a seaman to have more than one Jones Act employer. Id. at 225-26." (Emphasis ours)
Rivers contends that, not only was he an employee of Meldeans at the time of injury, he was also a borrowed employee of Schlumberger at that time. On this basis he seeks to hold both of these defendants jointly liable.
The factors which must be considered in making the determination of the employer-employee relationship between Schlumberger and Rivers are set forth in Norris' Supplement to the Law of the Sea, § 676. They are as follows:
"1. Was there an understanding or agreement by the employers regarding the loan of the employee?
"2. Has the servant assented, either expressly or by implication, to the transfer?
"3. Did the servant perform his work pursuant to direct orders of the asserted employer or was he following mere suggestions?
"4. Did the general employer temporarily terminate its relationship with the servant?
"5. Has the temporary employer furnished the necessary instruments and the place for the performance of the work in question?
*812 "6. Has the employment of the servant by the temporary employer extended over a considerable length of time?
"7. Is the work performed the work of the temporary employer?
"8. Does the temporary employer have the right to discharge the servant?
"9. Is the temporary employer obligated for the payment of the wages of the servant?"
For a discussion and application of these factors, see the case of Ruiz v. Shell Oil Company, 413 F.2d 310 (5th Cir. 1969).
In the case at hand, Elevating Boats was a corporation engaged in the construction and rental of elevated boats to companies who serviced oil well operations. Meldeans was also a corporation who owned two elevated boats which it rented to such service companies. One of Meldeans' boats was called the "Billiot." Meldeans entered into an agreement with Elevating Boats wherein Elevating Boats would secure rental customers for Meldeans. For this service Elevating Boats would receive six percent of the rental fees paid for the boat. Elevating Boats was authorized to enter into contracts for the rental of Meldeans' boats, which contracts would be binding on Meldeans as well as Elevating Boats. In this respect, Elevating Boats was acting as agent for Meldeans.
On April 20, 1972, Elevating Boats entered into a five year contract with Schlumberger for the use of the Billiot at a monthly rental of $6,000.00. This agreement contained the following provision:
"OWNER'S Masters (and crews) shall in no event be considered employees of SCHLUMBERGER it being understood and agreed that OWNER'S Masters shall be in full charge of this vessel at all times. Each vessel (and crew) shall be subject to the sole direction and control of the OWNER and its masters, and the OWNER and its Masters shall be solely responsible for the method of navigation, the control of the vessel and the course to be followed and all other matters concerning the operation and navigation of the vessel."
From the above, the parties expressly agreed that no employees of Meldeans could be considered an employee of Schlumberger.
As to whether Rivers assented to the transfer to Schlumberger, it may be said that while plaintiff certainly acquiesced in his working relationship with Schlumberger, nothing in the record reveals that he considered himself to have been transferred from Meldeans to Schlumberger.
Rivers did work under Schlumberger's instructions in that he went where they wanted him to, when they wanted him to and when on a job he positioned his boat in accordance with their wishes. But, Rivers, as captain of the boat, was in charge of his vessel and had the authority not to follow Schlumberger instructions if such would endanger the vessel in any way. Schlumberger was interested in results, that is, in having a platform from which their employees could perform their well servicing operations, not in directing plaintiff in piloting his boat. It also must be remembered that at the time of plaintiff's accident he was enroute to dump paint chippings, the result of maintenance work done on board the Billiot. In such maintenance activities, Schlumberger exercised no control at all over Rivers.
The facts indicate that nothing more than cooperation existed between Rivers and the employees of Schlumberger. In considering whether the authority exists to control a servant, a careful distinction must be made between authoritative direction or control and mere suggestion as to details or necessary cooperation. This is especially applicable where the work furnished is part of a larger undertaking. "Cooperation," as distinguished from "subordination," is not enough to create an employment relationship. Ruiz v. Shell Oil Company, supra, and Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). Under the totality of the circumstances herein, we conclude that the activities performed by Rivers were cooperation between him and Schlumberger but not subordination or control.
*813 Further, Meldeans never terminated its relationship with Rivers. Meldeans, not Schlumberger, had the right to discharge Rivers. Meldeans, not Schlumberger, was responsible for paying plaintiff. Meldeans issued his checks, withheld his taxes and paid the employer's share of social security.
Further, the work performed by Rivers was clearly in furtherance of Schlumberger's objective of providing certain geological testing services to oil and gas wells, but it was Meldeans, not Schlumberger, that was in the business of providing transportation and working platforms in the submerged areas of Louisiana. Thus, Rivers was engaged in Meldeans' work, which was to provide jack-up boats and pilots to those that needed such an unusual form of transportation. Maintenance of the boat, the activity in which Rivers was engaged at the time of the accident, is even more clearly the work of Meldeans.
We have considered the factors enunciated in light of all the circumstances presented herein and we conclude that the trial judge correctly concluded that Rivers was a seaman employee of Meldeans but not an employee of Schlumberger.
(2) Whether Meldeans was the Alter Ego of Elevating Boats.
Plaintiff urges the court to "pierce the corporate veil" of Meldeans and hold that Meldeans is actually the alter ego of Elevating Boats and, thus, Elevating Boats should be held to be an employer of Rivers and liable for damages incurred by Rivers.
In the case of Haynes v. Champagne Tile Corporation, 228 F.Supp. 157, 159 (E.D.La. 1964), the court held as follows:

"While the plaintiff recognizes that a corporation, under Louisiana law, is a separate legal entity, Louisiana Civil Code (1870) Article 435, he nevertheless urges this Court to `pierce the corporate veil,' and hold that Champagne Tile Corporation is actually the alter ego of J. C. Champagne, Inc., and therefore should be held liable for the debts of J. C. Champagne, Inc. Under Louisiana law, the `corporate veil' is pierced when the theory of separate entity leads to an absurdity, or the persons involved in a corporation seek to use this legal fiction to immunize them from the consequences of their fraud or illegal actions. Keller v. Haas, 202 La. 486, 12 So.2d 238 (1943); National Surety Corporation v. Pope, 147 So.2d 239 (La.App. 4th Cir. 1962)...."
Applying these principles to the facts herein, we find no reason to pierce the corporate veil as contended by Rivers. The two corporations, Elevating Boats and Meldeans, are separate corporations with different stockholders, with the exception of one stockholder who owns only a five percent stock interest in both corporations. The bookkeeping systems and other records of the two corporations are kept separately. Each holds their own stockholder and board meetings. Meldeans declares dividends among its stockholders who are principally employees. It was admitted on oral argument that no fraud or illegal actions existed herein. The evidence is clear that Rivers has failed to produce any evidence that would be grounds for piercing the corporate veil herein.
The cases cited by Rivers are not applicable. They deal with factual situations which fully justified the piercing of the corporate veil.
(3) Meldean's Liability.
The Jones Act goes beyond the scope of traditional maritime law in that it applies to injuries which occur on land. The test for Jones Act liability is not whether the injury occurred on navigable waters but rather whether a seaman was injured by employer negligence in the course of his employment. Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959). To be actionable under the Jones Act, the employer's negligence does not have to have as great a causal connection to the injury as is true in general tort law.

"... The question of proximate cause in an action under the Jones Act turns on whether the actions of the defendant contributed to the injury even in the slightest degree...." *814 Spinks v. Chevron Oil Company, 507 F.2d 216, 221 (5th Cir. 1975); Sanford Bros. Boats, Inc. v. Vidrine, 412 F.2d 958 (5th Cir. 1969).
Further, a Jones Act employer has a non-delegable duty to furnish a seaman with a safe means of ingress and egress to and from the vessel. The scope of this duty extends from the vessel to the shore and includes the dock to which the vessel may be berthed, and adjacent land. The vessel owner has the duty to inspect the means of ingress or egress and to take reasonable precautions to remedy same. Failure to perform any of these duties is negligence. Hocut v. Insurance Company of North America, supra; Hebert v. Otto Candies, Inc., 402 F.Supp. 503 (E.D.La.1975).
The Billiot had been berthed at this dock for a considerable length of time. The dock has a walkway adjacent to and parallel to the bank for a distance of approximately 100 feet. The elevating boats were brought into position with the stern of the vessel next to the walkway. The "legs" are then lowered until they touch the bottom of the bayou, thereby stabilizing the boat against the dock. This was the position of the boat at the time of the accident.
The hole or washout in question was located directly across the walkway from the stern of the boat. The washout was adjacent to the walkway. The condition had existed for several months and such condition was known to all who traversed the area. The area had been traversed by Schlumberger employees, Meldean employees and the port captain for Elevating Boats. The port captain inspected the boats approximately once each month. The size of the hole was approximately 3 feet wide and 4 feet deep. It presented an unsafe condition for those who used this area for ingress to and egress from the Billiot. The hole was usually covered by a piece of plywood. This plywood was not always present, however, and when the plywood was not in place, those going to or from the boat would step across the hole. Such was the condition on the night in question.
The Billiot had been berthed at this dock on standby for a few days. Rivers came on duty three days before the accident. Rivers and another captain were assigned to the Billiot. They alternated working seven days on and seven days off. No other crewmen were assigned to the boat.
On Friday night, January 28, 1977, at approximately 9:00 P.M., Rivers was performing maintenance work in the engine room. As a result of some previous scraping and painting, he had accumulated some scrapings in a can. He decided to empty them on the bank. He went to the stern, crossed the walkway, stepped across the washout and when he placed his weight on the opposite side, the bank of the hole caved in, causing Rivers to fall into the hole, injuring himself.
The question then becomes: Did the employer's (Meldeans') negligence play any part, even the slightest, in causing the fall and injuries to Rivers? This court finds that Meldeans, an employer, owed Rivers the non-delegable duty to provide a safe method of boarding and departing the vessel. Meldeans failed to carry out this duty, which failure is negligence. Hocut v. Insurance Company of North America, supra; Superior Oil Co. v. Trahan, 322 F.2d 234 (5th Cir. 1963).
Defendants argue that, as captain of the Billiot, Rivers had a duty to maintain the dock area in a safe condition. They contend that the failure to perform such duty was the sole cause of the accident. Defendants cite the following cases to support their position: Peymann v. Perini Corporation, 507 F.2d 1318 (1st Cir. 1974), writs den., 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975); Reinhart v. United States, 457 F.2d 151 (9th Cir. 1972), and Walker v. Lykes Bros. S. S. Co., 193 F.2d 772 (2nd Cir. 1952). These cases stand for the general proposition that a seaman may not recover where such seaman's breach of duty constitutes the sole cause of the accident and injury. A brief summary of the facts in these cases show that they are clearly distinguishable from the case at hand.
The facts of these cases are substantially as follows:
*815 In Peymann, the chief engineer was injured when he slipped from an oil covered iron railing while attempting to fasten a chain fall to the ceiling of the engine room. The chief engineer was in charge of this procedure and he failed to provide a safe place to work when he did not obtain an available ladder for the work, or if the rail was used, it was his duty to see that it was free of oil before he stepped upon it.
In Reinhart, the chief mate was injured when he was performing duties down in the hold of the ship. The sheathing had been previously damaged, creating an unsafe condition. The chief mate's duties included the inspection of the sheathing after each voyage since damage to same was not unusual. The chief mate also had the duty to inspect and provide adequate lighting in the hold. This, he also failed to perform.
In Walker, the captain was injured when the ship rolled, causing a steel file drawer to roll out of its cabinet, striking the captain, causing leg injuries. The safety catches on the drawer had been out of order for four months, all to the knowledge of the captain. The vessel had made a number of ports of call during this period but the captain failed to have the catches repaired.
In each of the cases above, the failure of the seaman's duty was the sole cause of the accident. The rulings in these cases, however, are not applicable to the circumstances herein.
We have heretofore held that Meldeans failed in its non-delegable duty to provide a safe method of ingress and egress to the vessel. Further, there is no showing that Rivers had any authority to perform, or have performed, any substantial repairs to the dock area which was owned and controlled by Schlumberger. Under these circumstances, we cannot hold that Rivers' injuries were caused by his neglect to perform a duty. The cause of this accident was the failure of Meldeans to provide a safe method of ingress and egress to the vessel.
A case more on point with this case is Hebert v. Otto Candies, Inc., 402 F.Supp. 503 (E.D.La.1975). In that case, recovery was granted for the drowning death of the crew boat captain due to the lack of a safe means of ingress and egress. We conclude that Rivers did not breach a duty, thereby barring his right to recovery.
Meldeans can find no comfort in its argument that it is relieved of liability because the dock was under the control of Schlumberger. The trial court, in its reasons for judgment, stated that the existence of the condition was common knowledge to both Schlumberger and Elevating Boats (Meldeans' agent). The trial court noted that the condition had concerned the employees of these parties for quite some time. Meldeans, however, negligently allowed the continued existence of this unsafe condition. The record reflects that shortly after the accident, a Meldeans official, with the cooperation of Schlumberger, remedied the condition by filling the washout or hole. This could have also been done before the accident, but Meldeans neglected to do so.
Defendants further contend that Rivers was negligent and that such negligence caused the accident. Defendants contend that Rivers knew the washout existed and should have berthed the boat at another berth. Also, it is contended that Rivers was negligent when he attempted to traverse the unsafe area with knowledge that such existed. We will now discuss these two contentions.
We find the contention, that plaintiff was negligent in not docking his jack-up boat in a vacant berth between the normal docking location of the Billiot and that of the Jay Elevator, without merit. The testimony at trial establishes that there were offsetting considerations for not using the middle berth. The middle berth was considered less desirable because it was not protected by the sides that extended perpendicular to the dock on each end of the docking area. The Billiot had been berthed in this particular area and it was desirable to continue using the same spot to jack up the boat since letting the legs down, onto areas previously used, gave them a more solid foundation to stabilize the boat. It is *816 also true that the Billiot had been docking in that spot for a considerable period of time before Rivers was assigned to her.
Under the facts presented, we cannot say that Rivers was negligent in his berthing of the vessel in the usual area.
As to Rivers' negligence in attempting to traverse the unsafe area, we must first point out, as was done in Spinks v. Chevron Oil Company, 507 F.2d 216, 223 (5th Cir. 1975), that under the law of admiralty:
"Because of strong policy considerations in admiralty, legal cause analysis is particularly suited to maritime tort law. Seamen as a class have often been styled `wards of the court', and employers have been assigned a high standard of duty towards them. This policy of protecting seamen from the hazards of their profession is evidenced by the employer's strict liability for providing a seaworthy vessel, and supplying maintenance and cure for ill seamen. In negligence cases, admiralty prohibits defenses of assumption of risk, see Neal v. Saga Shipping Co., 5 Cir. 1969, 407 F.2d 481, ...."
A seaman's duty to protect himself is slight. His duty is to do the work assigned, not to find the safest method to work. Spinks v. Chevron Oil Company, supra. Any negligence of a seaman which causes his injury is subject to the law of comparative negligence.
With these principles in mind, we examine the facts to determine whether the trial court was correct in finding that Rivers was free of negligence.
The testimony of several witnesses indicated that everyone going to and from the vessel traversed the hole with impunity. No one saw fit to detour around it. Plaintiff testified as to how the fall actually occurred:
"Q. Did you put your foot where you intended to put it?
"A. Yes sir. Yes sir.
"Q. Did you think at that time that there was going to be any problem? Did you expect there to be any caving in of the hole?
"A. No sir, I didn't really expect it, but . . .
"Q. It did occur, though?
"A. Yes sir. It did.
"Q. Uh, did you actually think it safe to do what you did do?
"A. Well, I'd done it many a time before and, you know, I thought-I didn't think I was acting in a reckless way. I'll put it that way."
Plaintiff had acted in a similar manner many times without mishap. He had no reason to believe that when he stepped to the opposite side of the hole, that the bank would cave in. We cannot say that the trial court was clearly erroneous when he found that plaintiff was free of fault.
(4) Whether Rivers Can Recover from Schlumberger Under Louisiana Tort Law (LSA-C.C. art. 2315)
Rivers petitioned the court for specific relief under the Jones Act and General Maritime Law. The allegations are clearly drafted to the end of establishing liability under said federal law. The petition does not mention any action under Louisiana Tort Law. Rivers' counsel takes the position that enough evidence was presented to bring the action against Schlumberger within the purview of Louisiana Tort Law without having to plead same. With this argument, we disagree.
Our Supreme Court, in the case of Lavergne v. Western Co. of North America, Inc., 371 So.2d 807, 809 (La.1979), after discussing the fact that this type suit may be brought in either the federal or state courts, went on to hold as follows:
"... However, regardless of in which court the action is brought, the federal substantive admiralty or maritime law applies if the claim is one cognizable in admiralty. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed. 798 (1962); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Garrett v. Moore-McCormack Company, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942)." (Emphasis ours)
*817 In the case at hand, Rivers brought this action against Schlumberger under the federal law as stated above. We are relegated, under these circumstances, to apply the federal substantive admiralty or maritime law and not Louisiana Tort Law. We have performed this duty by applying such federal law, finding that the trial court properly dismissed Schlumberger as it was not an employer of Rivers under the provisions of the Jones Act.
Further, Rivers alleged in his petition that Schlumberger was his employer. This allegation, that Schlumberger was Rivers' employer (necessary to recover under the Jones Act), is inconsistent with the theory of recovery under Louisiana Tort Law. If Schlumberger was Rivers' employer, Rivers would have no cause of action against Schlumberger under Louisiana Tort Law. (Article 2315)
(5) Third Party Demands of Schlumberger.
Schlumberger filed a third party demand against Elevating Boats contending that the contract between them provided that Elevating Boats would indemnify Schlumberger for claims under the Jones Act, including attorney's fees incurred by Schlumberger. The contract entered into by Elevating Boats (agent of Meldeans) and Schlumberger contained the following provision:

OWNER agrees to either carry Workmen's Compensation with endorsements for Marine and Voluntary Compensation, the Jones Act and the United States Longshoremen's Compensation Act as respects OWNER'S Masters, crews and other employees, if any, and that there will be a waiver of subrogation by OWNER and its insurer in favor or [sic] Schlumberger or, in the alternative, to be responsible for and hold harmless and indemnify SCHLUMBERGER for any losses normally covered by such acts or provided for by the State of Louisiana."

Schlumberger furnished the dock in question. It also had a duty to keep the dock area in a safe condition. Schlumberger was clearly negligent in failing to perform its duty and such negligence, along with the negligence of Meldeans, caused the accident by not filling the hole where Rivers fell. It is well settled that contractual indemnification for one's own negligence cannot be allowed unless the parties specifically, clearly and expressly agree to such. Batson-Cook Company v. Industrial Steel Erectors, 257 F.2d 410 (5th Cir. 1958). A reading of the indemnification paragraph above contains no such provision.
This demand of Schlumberger was properly dismissed by the trial court.
(As we have previously noted, the alleged third party demand of Elevated Boats and Meldeans against Schlumberger does not appear in the record for disposition.)
(6) Quantum.
Finally, we consider whether damages were awarded in the proper amount. We do so, keeping in mind that the trial judge must be found clearly erroneous before a disturbance of his award is warranted.
Rivers' only disagreement with the trial court's award is the award of $62,000.00 for the loss of future earnings. The trial court awarded $100,000.00 for losses of past and future earnings, $38,000.00 of which was designated as losses of past earnings. Rivers contends that the award of $62,000.00 is too low. Rivers' argument principally results from the trial court's finding that Rivers would, in the future, be able to engage in some type of gainful employment which does not entail heavy lifting.
The defendants contend that Rivers had a prior back condition which was of such magnitude that the injury herein complained of did not effectively change his condition.
The trial court, in its written reasons for judgment, reviews in detail the medical testimony, Rivers' work history and other evidence pertaining to the subject of quantum. The trial court concluded as follows:

"A review of the testimony of Dr. La-Rocca, Dr. Davis and Dr. Fresh convinces me that plaintiff sustained, from the fall, *818 in addition to the comparatively minor injury to his thoracic spine, a ruptured intervertebral disc at L5-S1. Plaintiff was disabled thereby and achieved his maximum improvement in about one year following the surgery (Dr. Fresh 14)."

The trial court also determined that Rivers:
"... was not able to return to the type of work in which he was engaged at the time of the accident ..."
The court did observe, however, that Rivers:
"... should be able to engage in some type of gainful employment which does not entail heavy manual labor."
These findings of the trial court are fully supported by the record. We find no reason to disturb these findings, nor the awards of the trial court.[2]
For the reasons assigned, the judgment of the trial court is affirmed. It is ordered that Schlumberger's third party demand against Elevating Boats be dismissed. It is also ordered that the "Motion for Sanctions and Costs" filed by Schlumberger be dismissed. Costs of this appeal shall be prorated between Meldeans and Schlumberger, with each to pay fifty percent (50%) thereof.
AFFIRMED.
NOTES
[1] The proper title of Schlumberger Well Surveying is Schlumberger Well Services, a Division of Schlumberger Technolology Corporation.
[2] Schlumberger also filed in this court a "Motion for Sanctions and Costs" against Elevating Boats alleging that due to the delay of Elevating Boats' counsel to send Schlumberger's counsel a copy of Elevating Boats' brief, a motion to compel such production was necessitated. Schlumberger's counsel seeks attorney's fees and costs for the filing of such motion.

Schlumberger cites no authority for this court to impose a sanction of payment of attorney's fees for such delay. We have been unable to find any authority for the imposition of such sanctions. The motion shall be denied.